| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | Case No. 2:14-cv-00226-APG-VCF |
| Plaintiff, | |
| v. | |
| UNITED STATES BUREAU OF LAND MANAGEMENT, et al., | |
| Defendants. | |
| WHITE PINE COUNTY, et al., | Case No. 2:14-cv-00228-APG-VCF |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES BUREAU OF LAND MANAGEMENT, et al., | (ECF Nos. 87, 93, 97, 99, 107, 110) |
| Defendants. | |

The plaintiffs in these consolidated cases challenge the Bureau of Land Management's decision to approve the first phase of a massive water-redistribution pipeline that, when completed, will carry millions of gallons of water from rural areas of eastern-central Nevada to Nevada's most populous county, Clark County. The plaintiffs—the Center for Biological Diversity, Confederated Tribes of the Goshute Reservation, White Pine County, and the Ely Shoshone and Duckwater Shoshone Tribes—all believe that BLM violated several environmental statutes by approving this phase of the project. They move for summary judgment, seeking to halt construction. BLM and Intervenor Southern Nevada Water Authority (the Nevada agency that applied for permission to build this project) both move for summary judgment as well, arguing that BLM properly approved this phase.

////

////

1    I am sensitive to the strong feelings and weighty interests at stake in this contest over

2    Nevada's water—after all, in the West, "whisky's for drinkin' and water's for fightin' over."[1]

3    There can be no question that drawing this much water from these desert aquifers will harm the

4    ecosystem and impact cultural sites that are important to our citizens. On the other hand,

5    southern Nevada faces an intractable water shortage. But regardless of whether I think this

6    pipeline is a good or bad idea, my power to review BLM's decision is narrow and set by statute. I

7    must evaluate whether BLM gathered enough information about the project's impacts and used a

8    reasonable, transparent process for determining whether the project should be approved.

9        For the most part, I cannot say that BLM violated its duties in approving this portion of

10   the pipeline project. The plaintiffs' primary complaint is that BLM punted the specifics of some

11   of its assessments until later phases of the project. But given that this is a large, complex project

12   that the agency is reviewing in pieces, it must be given some leeway to figure out an efficient and

13   effective way to manage its review as a whole. Courts have acknowledged that agencies need

14   such discretion when reviewing massive projects like this, and it doesn't get much more massive

15   than this 40-year construction project. BLM has determined in its expertise that reviewing this

16   project in phases makes the most sense and that some parts of its review should wait. BLM's

17   decision-making process here was not perfect. But given the scale of this project and the years of

18   development to come, the agency's approval of the first phase of the pipeline was generally not

19   arbitrary or capricious.

20       That said, there are two narrow areas where I conclude BLM did not meet its obligations.

21   Both involve substantive rules that compel BLM to mitigate certain types of lost habitat. BLM

22   used a sophisticated groundwater model to project how much habitat would be lost, but it failed to

23   explain how BLM or SNWA would mitigate those losses. This omission violated the National

24   Environmental Protection Act's requirement for BLM's Environmental Impact Statement to at

25   least discuss whether and how the project will comply with other environmental rules. I thus

26   remand back to BLM so that the agency can address these narrow deficiencies.

27   _____

28       [1] Anonymous; often attributed to Mark Twain.

# I. Factual Background

## A. General overview of the project

This case arises from BLM approving SNWA's application to build a massive pipeline to convey water from Spring, Delamar, Dry Lake, and Cave Valleys in eastern-central Nevada to Las Vegas. This pipeline is a nearly-unprecedented feat of engineering and water reallocation, and stands to move over 27 million gallons of water each year. It will cost billions of dollars and nearly four decades to complete.

SNWA has been developing this project since 1989.[2] Over the last two plus decades, the agency has been working with state and federal authorities on this project as one of several solutions to southern Nevada's longtime water crisis.[3] BLM's role is to decide whether to give SNWA permission to build its pipelines and supporting facilities on federally-controlled land between Clark County and the water aquifers (the underground lakes that will be tapped for the water). But it is the State of Nevada, not the federal government, that must approve SNWA's claim to the water itself.[4]

BLM's authority to issue a right-of-way (in other words, to allow SNWA to build its pipeline on federal land) comes from three statutes. First, the Federal Land Policy and Management Act (FLPMA) authorizes BLM to manage public lands by balancing various public interests, including environmental, recreational, and other interests like municipal water supply needs. FLPMA requires BLM to consider any applications for rights-of-way to use federal lands for these purposes.

In the next two statutes, Congress specifically directed BLM to approve requests to build water pipelines in Nevada. The Southern Nevada Public Land Management Act (SNPLMA) says that, upon application by a local or regional governmental entity and in accordance with FLPMA

---

[2] At that time, SNWA was known as the Las Vegas Valley Water District.

[3] Administrative Record ("AR") 129677, 131372.

[4] For a discussion of the process of states' allocation of water, *see* Joseph Regalia and Noah Hall, *Interstate Groundwater Law Revisited: Mississippi v. Tennessee,* 34 Va. Envtl. L.J. 152, 167 (2016) (discussing state control and ownership of water).

1  and other applicable laws, BLM "shall issue right-of-way grants on Federal lands in Clark

2  County, Nevada" for a pipeline and related facilities for "transportation or distribution of water."[5]

3  The Lincoln County Conservation, Recreation, and Development Act (LCCRDA) states that

4  BLM "shall grant to [SNWA] and the Lincoln County Water District nonexclusive rights-of-way

5  to federal land in Lincoln County and Clark County, Nevada for . . . pipelines . . . that are

6  necessary for the construction and operation of a water conveyance system."[6]

7       The project depends on SNWA receiving water rights from the State of Nevada—

8  otherwise, SNWA will have no water to pump. Initially, Nevada's State Engineer granted SNWA

9  over 100,000 afy (acre feet per year) of water. In March of 2012, the State Engineer revised that

10  amount to allow SNWA to pump up to 83,988 afy of groundwater. A few months later, BLM

11  approved SNWA's application for a right-of-way for the first phase of the project, which includes

12  the main pipeline.[7]

13       Because of the complexity and scope of this decades-long construction project, BLM

14  decided to review it in phases. BLM's current decision does not approve a right-of-way for any

15  groundwater pumping facilities or other pipelines. Rights-of-way for those facilities would have

16  to be evaluated separately in a process conducted in accordance with the National Environmental

17  Policy Act (NEPA) and FLPMA. BLM is not obligated to grant rights-of-way for those future

18  parts of the project.[8] SNWA will submit separate applications identifying those facilities, and

19  BLM will analyze them on their own.[9]

20  / / / /

21  / / / /

22

23       [5] Pub. L. No. 105-263, 112 Stat. 2343 (1998).

24       [6] Pub. L. No. 108-424, 118 Stat. 2403 (2004).

25       [7] AR 188178.

26       [8] AR 188132. BLM's lawyer agreed during oral argument that approval of SNWA's
future applications is not a *fait accompli*; rather, BLM can deny future applications, and must if

27  they violate applicable laws and rules.

28       [9] AR 188132.

1      SNWA's right-of-way for this main pipeline is subject to several terms and conditions,

2   including requirements for mitigation and monitoring.[10] Once SNWA finishes some

3   preconstruction obligations (such as geological surveys), BLM will develop a Construction,

4   Operation, Maintenance, Monitoring, Management, and Mitigation Plan (COM Plan).[11] The

5   COM Plan will address mitigation and monitoring for the construction, operation, maintenance,

6   and abandonment of the main pipeline and subsequent phases of the project. After SNWA has

7   received all necessary approvals from BLM and secured the necessary water rights, construction

8   of the main pipeline, including two lateral pipelines from Cave and Spring Valleys, will take up

9   to five years. Even if all goes as planned, it will take approximately 38 more years for the project

10  to be fully constructed.[12]

11      **B. BLM's approval of SNWA's first phase of construction, the trunk pipeline, and
         its high-level programmatic review of the project as a whole**

13      SNWA applied for a right-of-way for this project in August 2004.[13] BLM began

14  reviewing the application in April 2005. It issued a draft Environmental Impact Statement in

15  June 2011 and solicited public comments for 120 days. Because this project is large, complex,

16  and spread out over a number of years, BLM used a tiered approach to analyze the environmental

17  impacts under NEPA. BLM explained that this tiered approach was needed because it does not

18  yet have crucial information, such as the location of the well sites or the precise hydrology and

19  geology of the aquifers. In this first phase and EIS, BLM analyzed the environmental impacts of

20  the construction and operation of the main pipeline, and also analyzed on a "programmatic level"

21  the potential impacts of the completed project in its entirety. In future phases, BLM will conduct

22

23

24

25      [10] AR 188134.

26      [11] AR 188134-35.

27      [12] *See* AR 188341, 188346.

28      [13] AR 129669.

1 site-specific analyses of the environmental impacts of particular groundwater pumping facilities.

2 These future analyses will also revisit the programmatic assessment of the entire project.[14]

3 Although the current decision under review approves only the main trunk pipeline, BLM

4 conducted a high-level review of the project as a whole, including the impacts of drawing the

5 water. BLM relied on a computer model of groundwater flow that was developed to evaluate the

6 probable long-term effects of future groundwater withdrawal for the project on a regional scale.[15]

7 The model was reviewed by a team of hydrology experts, including scientists from the United

8 States Geological Survey and independent groundwater modeling experts. The team met several

9 times to develop and hone the model so that it was as accurate as possible. The model considered

10 the hydrogeological framework of the basins, the rate of recharge to the groundwater system,

11 evapotranspiration, and spring flow.[16] BLM assumed it would take 38 years for SNWA to

12 complete the project, and it analyzed potential impacts for three different timeframes: full build

13 out, 75 years after build out, and 200 years after build out.

14 Using this model, BLM simulated the impacts on groundwater based on seven alternatives

15 and an alternative where no pipeline is constructed. These alternatives included the full amount

16 of SNWA's water rights application as well as lesser amounts in accordance with prior rulings by

17 Nevada's State Engineer. The alternatives also varied based on well placement and whether

18 pumping would be conducted in certain valleys. In its final approval of this phase of the project,

19 BLM selected a modified version of Alternative F. Alternative F would have allowed the

20 pumping of 114,129 afy in Spring, Delamar, Dry Lake, and Cave Valleys; the amount of water

---

[14] Although the plaintiffs suggested at oral argument that BLM will not revisit its review of the entire project in future EISs, it offers no evidence or analysis to support this contention. BLM is obligated under NEPA to consider all of the impacts of each future stage of the project. And approving, for example, the water extraction facilities will obviously impact the environment in ways similar to the approval of the trunk pipeline at issue here. BLM has confirmed that it will review the project as a whole at each future stage, which will give the public additional opportunities to raise any relevant environmental impacts.

[15] AR 188141.

[16] AR 188141, 130084-87.

1 was based on information presented during the 2011 water rights hearings before the State

2 Engineer. Following the issuance of the State Engineer's water rights ruling in March 2012,

3 BLM revised its modified version of Alternative F by adopting the State Engineer's allocation of

4 83,988 afy.

5       After it issued its draft EIS, BLM received 461 comment letters and over 20,000 form

6 letter comments, from federal and state agencies, Indian tribes, and the public.[17] BLM responded

7 to many of these comments.[18] The final EIS was released to the public in August 2012 for a 60-

8 day review period. More than 40 comment letters and 33,000 form letters were submitted during

9 that period, and BLM considered those comments prior to issuing its record of decision approving

10 SNWA's application (the ROD).[19]

11       **C. Nevada state court proceedings on SNWA's water rights**

12       At the time BLM approved SNWA's right-of-way for the main pipeline, Nevada's State

13 Engineer had authorized SNWA to pump 83,988 afy. Various entities, including White Pine

14 County and the Goshute Tribe, appealed the State Engineer's decision in Nevada state court.[20]

15 That court found that the State Engineer's findings were inadequate and remanded back to the

16 State Engineer. The court instructed the Engineer to: (1) add Millard and Juab Counties in Utah

17 to the mitigation plan for the pumping of groundwater from Spring Valley; (2) recalculate the

18 water available for appropriation from Spring Valley, considering whether the basin would reach

19 equilibrium in a reasonable time; (3) define monitoring and mitigation standards for Spring, Cave,

20 Dry Lake, and Delamar Valleys; and (4) recalculate the water rights appropriations from Cave,

21

22

23

24

25      [17] AR 188168-69.

     [18] AR 188169.

26      [19] AR 188170-71.

27      [20] *See White Pine County v. King*, No. CV 1204049, slip op. (Seventh Judicial Dist. of the

28 State of Nevada, Dec. 10, 2013).

| 1 | Dry, and Delamar Valleys to avoid conflicts with other water users. The State Engineer has not |
| 2 | yet revised his findings or SNWA's allocation.[21] |

**D. BLM's consultations with Nevada's Native American tribes**

| 4 | During the seven years that BLM reviewed SNWA's application, the agency consulted |
| 5 | with 28 tribes about the project and its potential impacts.[22] BLM held an open house for the |
| 6 | tribes; conducted field visits with an ethnographer; participated at an inter-tribal meeting attended |
| 7 | by the Goshute's leaders and lawyers, BLM State Director, and the federal Bureau of Indian |
| 8 | Affairs Deputy Regional Director; attended seven other inter-tribal meetings; drafted a |
| 9 | comprehensive ethnographic assessment; and received 22 visits from the Ely District's Native |
| 10 | American Liaison.[23] BLM also conducted a series of outreach sessions with tribal |
| 11 | representatives.[24] BLM detailed its outreach efforts in its EIS. |

**II. Discussion**

**A. Standard of review**

| 14 | My review of the plaintiffs' claims is governed by the judicial review provisions of the |
| 15 | Administrative Procedure Act (APA).[25] Under the APA, agency decisions may be set aside only |
| 16 | if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with |
| 17 | law."[26] Review under this standard is "'highly deferential, presuming the agency action to be |
| 18 | valid and affirming the agency action if a reasonable basis exists for its decision.'"[27] An agency's |
| 19 | decision will be overturned only if the agency relied on factors that Congress did not intend it to |

---

[21] At oral argument, the parties reported that the State Engineer will conduct a hearing in September 2017.

[22] *See* AR 189770-190409 (documenting BLM's government-to-government consultation and outreach effort); AR 189782-87 (table summarizing contacts).

[23] *See* AR 189814-17 (summarizing consultation with Goshute Tribe).

[24] AR 189894-190237 (materials from meetings, trainings, and workshops with tribes).

[25] 5 U.S.C. §§ 701-06; *ONRC Action v. BLM*, 150 F.3d 1132, 1135 (9th Cir. 1998).

[26] 5 U.S.C. § 706(2)(A).

[27] *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).

1 consider, failed to consider an important aspect of the problem, offered an explanation for its

2 decision that runs counter to the evidence before it, or is so implausible that it could not be

3 ascribed to a difference in view or the product of agency expertise.[28] The APA "does not allow

4 the court to overturn an agency decision because it disagrees with the decision or with the

5 agency's conclusions about environmental impacts."[29]

6       Summary judgment is appropriate if there are no genuine issues of material fact and the

7 moving party is entitled to judgment as a matter of law. My review is based on the agency's

8 administrative record.[30] My role therefore is not to resolve factual issues, but rather to determine

9 whether the agency's record supports its decision under the APA's standard of review.[31]

10 **B. The plaintiffs' challenges under NEPA**

11     **i. Background**

12       NEPA serves the dual purpose of informing agency decision-makers of the significant

13 environmental effects of proposed major federal actions and ensuring that relevant information is

14 made available to the public so that it "may also play a role in both the decision-making process

15 and the implementation of that decision."[32] NEPA is procedural. "[I]t is now well settled that

16 NEPA itself does not mandate particular results, but simply prescribes the necessary process."[33]

17

18     [28] *McFarlane v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008) (citation and quotation marks omitted); *see also Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971) (role

19 of the reviewing court is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment").

20     [29] *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

21     [30] *See Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 883-84 (1990).

22     [31] *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994)

23 ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of this matter does not require fact finding on behalf of this court. Rather, the court's

24 review is limited to the administrative record."); *see also Occidental Eng'g Co. v. Immigration and Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985) (noting that under the APA "the

25 function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision that it did").

26     [32] *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

27     [33] *Id.* at 350 (citing *Stryker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227

28 (1980)).

1  "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA
2  merely prohibits uninformed—rather than unwise—agency action."[34]

3      To meet the procedural goals of the statute, NEPA requires that an agency prepare a
4  comprehensive EIS for "major Federal actions significantly affecting the quality of the human
5  environment."[35]  The Council on Environmental Quality's (CEQ) regulations implementing
6  NEPA provide guidance as to what must be included in an EIS.[36]  These regulations direct
7  agencies to include (1) an analysis of alternatives to the proposed action; (2) an analysis of direct,
8  indirect, and cumulative impacts on the environment; and (3) a discussion of ways to mitigate
9  adverse environmental impacts of the proposed action.

10      "The reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of
11  inconsequential, technical deficiencies."[37]  Rather, "[o]nce satisfied that a proposing agency has
12  taken a 'hard look' at a decision's environmental consequences, the review is at an end."[38]
13  The critical question is whether the EIS contains a "reasonably thorough discussion of the
14  significant aspects of the probable environmental consequences" of the proposed action as well as
15  a range of alternatives to that action.[39]  This "hard look" must be taken objectively and in good
16  faith—"not as an exercise in form over substance, and not as a subterfuge designed to rationalize
17  a decision already made."[40]

18  / / / /

19

20      [34] *Id.*

21      [35] 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

22      [36] *See* 40 C.F.R. § 1502.

23      [37] *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 126 F.3d 1158, 1184 (9th
   Cir. 1997) (citation omitted); *see also Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir.
24  1996); 40 C.F.R. § 1500.3 ("[I]t is the Council's intention that any trivial violation of these
   regulations not give rise to any independent cause of action.").
25
      [38] *Id.*
26
      [39] *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).
27
      [40] *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000); *S. Coast Air Quality Mgmt. Dist.
28  v. F.E.R.C.*, 621 F.3d 1085, 1095 (9th Cir. 2010).

At bottom, even if an agency violated NEPA, that does not mean a remedy is necessarily warranted. I must then consider whether any error "materially impeded NEPA's goals—that is, whether the error caused the agency not to be fully aware of the environmental consequences of the proposed action, thereby precluding informed decision-making and public participation, or otherwise materially affected the substance of the agency's decision."[41]

### ii. Whether BLM violated NEPA by failing to properly define the purpose and need for the pipeline project

NEPA requires an agency to include in its EIS a statement that "briefly specif[ies] the underlying purpose and need to which the agency is responding."[42] Agencies are afforded "'considerable discretion to define the purpose and need of a project.'"[43] But "an agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action."[44] Ultimately, the purpose and need statement should "be evaluated under a reasonableness standard."[45]

BLM sensibly states in the EIS that the "purpose for this [right-of-way] action is to consider the applicant's request for use of federal land managed by BLM for construction and operation of the proposed groundwater conveyance system," and that the need "arises from its responsibility under FLPMA and other legislation to respond to the applicant's [right-of-way]

---

[41] *Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy*, 860 F.3d 1244, 1251 (9th Cir. 2017); *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016).

[42] 40 C.F.R. § 1502.13.

[43] *League of Wilderness Defenders-Blue Mountain Diversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012) (quoting *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998)); *see also Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 866 (9th Cir. 2004).

[44] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1070 (9th Cir. 2010) (citation omitted); *see also City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).

[45] *Friends of Southeast's Future*, 153 F.3d at 1066-67.

1  request."[46] BLM did not narrow the purpose or need for its action: it was required to consider

2  whether a pipeline project should be approved to redistribute water in Nevada, and that is what it

3  did. This is particularly true given that Congress directed BLM to review and approve water

4  pipeline projects in this corridor. And BLM did not frame its purpose so narrowly that it was

5  unable to consider alternatives—indeed, it considered a number of them.

6         White Pine County argues that BLM improperly narrowed its purpose and need statement

7  by taking the position that it must approve SNWA's application. White Pine suggests that BLM

8  failed to "genuinely" review SNWA's application because the agency believed it had to approve

9  regardless of what its review revealed. But there is no evidence that BLM intended on approving

10 the project regardless of the consequences. While it is true that BLM noted that two statutes

11 required it to approve right-of-way requests like SNWA's, the statutory provisions the agency

12 relied on say that this approval depends on whether other statutes, including NEPA, are

13 satisfied.[47] BLM never indicated that it would approve this pipeline regardless of the outcome of

14 its NEPA analysis. Indeed, the agency conducted an extensive review and analysis of

15 environmental and other impacts. BLM even considered a no-action alternative, meaning it

16 considered not approving the project at all. This review belies White Pine's argument that the

17 agency was merely acting under pretext.[48]

18 / / / /

19 / / / /

20 / / / /

21

22        [46] AR 129671.

23        [47] AR 188126.

24        [48] *See Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1085 (9th Cir. 2013) ("[A]n
   agency must consider the statutory context of the proposed action."); *Honolulutraffic.com v. Fed.*
25 *Transit Admin.*, 742 F.3d 1222, 1230 (9th Cir. 2014) (upholding a purpose and need statement
   that was "defined in accordance with the statutorily mandated formulation of [a] transportation
26 plan"); *see also Protect Our Communities Found. v. Jewell*, Case No. 13cv575 JLS (JMA), 2014
   WL 1364453, at *5 (S.D. Cal. Mar. 25, 2014) (upholding a purpose and need statement regarding
27 a renewable energy project where the statement was consistent with "the statutory, executive, and
   administrative directives invoked by BLM").
28

### iii. Whether BLM violated NEPA by inadequately considering alternatives to the selected project

NEPA requires agencies to consider in detail alternatives to a proposed action.[49]  In the final EIS, BLM considered six groundwater pumping and conveyance alternatives, as well as a no-action alternative.  White Pine County contends that BLM's unduly narrow purpose and need statement caused it to disregard viable alternatives.[50]  The County proposes alternatives, including Colorado River management measures, increased water conservation measures, and desalination facilities.[51]  The County contends BLM did not seriously consider these alternatives, restricting its analysis to the narrow band of variations of the project it ended up approving.  The County does not, however, argue that BLM gave short shrift to alternatives that were within the scope of its statement of purpose and need.  BLM responds here, as it did in rejecting the County's proposed alternatives in the EIS, that those alternatives did not meet BLM's articulated purpose and need.  BLM adds that it otherwise considered all feasible alternatives that could satisfy the purpose of the project.[52]  The agency was not arbitrary in determining that none of the alternatives proposed by White Pine County would meet that purpose.

Even if BLM had adopted White Pine County's preferred framing of the project—meeting the water needs of Southern Nevada—it reasonably concluded that none of the County's alternatives was feasible.  Modifications of Colorado River allocations would require an act of Congress.  BLM found that water conservation would be inadequate to satisfy the region's needs.  A desalination project would be highly expensive, technically difficult, and would also require modification of Colorado River allocations.[53]  SNWA points out that none of these alternatives would meet its need to reduce its current overwhelming reliance on the Colorado River for

---

[49] 42 U.S.C. § 4332(2)(C)(iii).

[50] ECF No. 98 at 35-36.

[51] Id. at 36.

[52] ECF No. 107-1 at 37-38.

[53] Id. at 38.

1 water.[54] BLM thus met its NEPA obligation to "[r]igorously explore and objectively evaluate all

2 reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly

3 discuss the reasons for their having been eliminated."[55]

### iv. Whether BLM violated NEPA by failing to take a hard look at the cumulative impacts on the environment and the impacts of climate change

6 The plaintiffs suggest that BLM did not take a hard-enough look at the environmental

7 impacts of the project as a whole, including the extent to which climate change might amplify

8 those impacts. Courts are "most deferential when reviewing scientific judgments and technical

9 analyses within the agency's expertise under NEPA" and will not "impose [ourselves] as a panel

10 of scientists."[56] The scope of an environmental analysis, "in addition to the extent and effect of

11 the cumulative factors[,] is a task assigned to the special competency of the appropriate

12 agencies."[57] Agencies have "discretion to determine the physical scope used for measuring

13 environmental impacts" so long as they do not act arbitrarily and their "choice of analysis

14 scale . . . represent[s] a reasoned decision."[58]

15 The plaintiffs first challenge BLM's analysis of the pipeline's impacts to the environment

16 generally. But the plaintiffs have not shown that BLM's methodologies in analyzing the impacts

17 were arbitrary or capricious. The EIS contains a thorough discussion of the potential impacts of

18 pumping groundwater over the long term. BLM largely relied on the groundwater flow model

19

20 [54] ECF No. 109 at 40.

21 [55] 40 C.F.R. § 1502.14(a).

22 [56] See Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1051 (9th Cir. 2012)
(internal citations and quotation marks omitted).

23

24 [57] Kleppe v. Sierra Club, 427 U.S. 390, 414 (1976) (concluding that Interior's choice to
limit scope of comprehensive statement was not arbitrary despite Respondent's argument that a
comprehensive statement on the whole region was required because all coal-related activity was

25 programmatically, geographically, and environmentally related); Neighbors of Cuddy Mtn. v.
Alexander, 303 F.3d 1059, 1071 (9th Cir. 2002) ("Under NEPA, we defer to an agency's

26 determination of the scope of its cumulative effects review.").

27 [58] WildWest Institute v. Bull, 547 F.3d 1162, 1173 (9th Cir. 2008) (quoting Idaho Sporting
Cong., Inc. v. Rittenhouse, 305 F.3d 957, 973 (9th Cir. 2002)).

28

discussed above. BLM based its model on similar models that have been made of the affected regions. The model team considered a variety of information, including field studies.[59]

   • The plaintiffs suggest that BLM was arbitrary in limiting its analysis to areas that are likely to experience at least a 10-foot decrease in groundwater level. But BLM offers reasons for limiting its analysis to these areas, including the large scale of the model and the natural fluctuations of groundwater. BLM's experts concluded that a lower limit would make it difficult to determine which impacts were caused by the water drawdown and which were caused by other natural factors. And the plaintiffs offer no specific argument why this reasoning is arbitrary or why a different limit is better. BLM is entitled to deference in determining the appropriate contours of its model.

   The plaintiffs also argue that BLM should not have limited its analysis to 200 years in the future. But an agency has wide discretion to determine the appropriate scope of its review. "NEPA does not impose a requirement that [an agency] analyze impacts for any particular length of time."[60] The plaintiffs offer no concrete reasons why a different time period is necessary.

   The plaintiffs' primary argument is that BLM should have given greater consideration to how climate change might affect the environmental impacts of the pipeline project. In other words, BLM's models should have assigned a quantitative measure for climate change's effects on the impact the pipeline project will have.

   But BLM adequately considered the impacts of climate change in approving SNWA's right-of-way. BLM considered "global climate change and regional climate change trends."[61] It noted that global surface temperatures have risen and will continue to rise in the future. And it

---

[59] Notably, the precise contours of BLM's model is entitled to deference. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("An agency must have discretion to rely on the reasonable opinions of its own qualified experts . . . ."); *see also Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc) ("We are to be most deferential when the agency is making predictions, within its area of special expertise, at the frontiers of science.") (citations and quotation marks omitted).

[60] *Selkirk Cons. Alliance v. Forsgen*, 336 F.3d 944, 962 (9th Cir. 2003).

[61] AR 129855-56.

1  considered the climate history for the regions directly impacted by the pipeline. Then BLM

2  analyzed the cumulative impact of climate change combined with the pipeline project.[62] The EIS

3  concludes that "[g]reater variability in patterns of precipitation can be anticipated," and an

4  increase in global temperatures over the next century could be associated with an increase in the

5  frequency of extreme weather events, such as drought, heat waves, and wildfires.[63]

6       The plaintiffs contend that it was not enough for BLM to generally consider the fact that

7  climate change might amplify harm to the environment, but that it was required to include

8  specific climate change data. But nothing in NEPA or the relevant case law suggests that is the

9  case.[64] The proper question is whether BLM acted arbitrarily when it determined that it was

10  preferable to broadly consider the impacts of climate change rather than quantitatively

11  considering its impacts. The plaintiffs fall short on this point, failing to point to any hard data

12  that BLM should have incorporated into its analysis. BLM concluded in its expertise that the

13  climate change data before it was not reliable enough to feed into its models, and there is no

14  evidence that this was an arbitrary decision. For example, there were no studies or evidence

15  quantifying the impact of climate change on groundwater. BLM's decision to consider climate

16  change's impacts qualitatively, and to not include its impacts quantitatively in its models, was

17  thus not infirm.[65]

18       **v.  Whether BLM inadequately considered impacts on cultural and religious sites**

19       The plaintiffs argue that BLM did not adequately consider how the pipeline would impact

20  Native American cultural sites. But the record reveals that the agency thoroughly considered the

21

22  [62] AR 129910-12, 129985, 130209, 130260, 130356-57, 130520, 130632-33, 130684, 130724, 130753, 130769, 130819, 130856, 130896, 130957, 130985, 131032, 131151, 131174.

23  [63] AR 130209.

24  [64] *Friends of the Wild Swan v. Jewell*, Case No. CV 13–61–M–DWM, 2014 WL 4182702 (D. Mont. Aug. 21, 2014); *S. Utah Wilderness Alliance v. Burke*, 981 F. Supp. 2d 1099, 1110-11 (D. Utah 2013) (finding that BLM's analysis of cumulative impacts sufficiently addressed the combined impacts of off-highway vehicle use and climate change).

25

26  [65] The CEQ's guidance on climate change suggests that agencies should consider its impacts, but it does not indicate that agencies are required to quantify those impacts or specifically predict the precise changes it will bring.

27

28

1    pipeline's potential impacts on these sites, which is what NEPA requires.[66] BLM analyzed

2    impacts on culturally significant plants and animals, including plant species identified by the

3    tribes through consultation.[67] These impacts are described in the vegetation section of the EIS,

4    which identifies impacts to culturally sensitive plants, their habitat, and wildlife that consume

5    them.[68] The EIS discusses the cultural and spiritual significance of water to the Goshute Tribe

6    and the tribe's objections to the groundwater pumping.[69] The EIS explains how the 76 possible

7    sites with religious and cultural significance might be affected.[70] Indeed, BLM identified several

8    important cultural sites while consulting with the tribes, and recommended those for designation

9    on the National Register as Traditional Cultural Property.[71] The EIS also discusses potential

10    ways to mitigate harm to cultural sites.

11        BLM again notes in the EIS that it did not do a more thorough analysis of potential

12    impacts on cultural sites because it does not yet have all the information it needs (such as the

13    location of the well sites), and that it will address additional concerns in later EISs as the project

14    progresses. This is a reasonable approach. The tribes have not otherwise identified any property,

15    site, or cultural resource that was omitted from or insufficiently analyzed in the EIS.

16        **vi. Whether BLM impermissibly "segmented" its NEPA analysis**

17        White Pine County argues that BLM's "tiered" approach to its NEPA analysis was an

18    improper attempt to "segment" its analysis such that the full impact of the project is not apparent

19    in any one analysis.[72] The County argues this approach was unreasonable, given that the general

20    contours of the project, as well as many of the specifics, have been established. It contends that

21    subsequent site-specific analyses will be "piecemeal," robbing BLM and the public of the

22

23           [66] AR 130991-131038.

            [67] AR 131001.

24

25           [68] AR 130288, 130290-130297, 130314, 130362, 130366, 131011, 131015-17.

            [69] AR 131001-03, 131017.

26           [70] AR 131006.

27           [71] AR 190479-81.

28           [72] ECF No. 98 at 29-31.

1   opportunity to reevaluate the entire project in light of the new information.  It also argues that the

2   current approval will set BLM on a path to "irreversible and irretrievable commitment of

3   resources to the Project," undercutting the utility of subsequent NEPA analyses.[73]

4        BLM responds that CEQ regulations authorize agencies to use tiered analysis for complex

5   projects where not enough information is known about later stages of a project to perform a

6   uniform, in-depth analysis at the beginning.[74]  BLM argues that its tiered process provided

7   specific analysis of the parts of the project on which it had sufficient information to do so,

8   conducted broad-stroke programmatic analysis of the overall project, and deferred site-specific

9   analysis of later components.  BLM also assures that, in the course of later site-specific analyses,

10  it will not employ a piecemeal approach but will instead reevaluate the project holistically.  BLM

11  adds that the only "irretrievable" commitment of resources at this point is to the main pipeline,

12  which was fully analyzed in this first phase; subsequent analyses could cause BLM to deny

13  SNWA authority to actually draw groundwater.[75]

14       "Tiering . . . is appropriate when it helps the lead agency to focus on the issues which are

15  ripe for decision and exclude from consideration issues . . . not yet ripe."[76]  BLM has "flexibility

16  in deciding the level of analysis to be performed at a particular stage."[77]  In a case similarly

17  involving "many separate sub-projects [that] will take many years" to complete, a court approved

18  an agency's decision to issue a programmatic analysis on the front end, leaving site-specific

19  analyses for later.[78]  BLM estimates this entire project will take 38 years to complete, and the

20  "actual plans for the development of future pumping facilities have not yet been developed."[79]

21  BLM made assumptions about well placements in order to complete its broad programmatic

22

23       [73] Id.

24       [74] ECF No. 107-1 at 39 (citing 40 C.F.R. § 1502.20).

25       [75] ECF No. 124 at 21.

26       [76] 40 C.F.R. § 1502.28(b).

         [77] Native Vill. of Point Hope v. Jewell, 740 F.3d 489, 498 (9th Cir. 2014).

27       [78] See Nevada v. Dep't of Energy, 457 F.3d 78, 91-92 (D.C. Cir. 2006).

28       [79] ECF No. 107-1 at 40, 45.

1    analysis, but it does not follow that BLM was required to conduct site-specific analyses based on
2    those speculative assumptions.
3         White Pine County also fails to rebut BLM's assertion that it retains authority to block
4    groundwater extraction generally and at specific well sites. The County's argument that BLM is
5    making an irreversible and irretrievable commitment of resources is thus undermined. Further,
6    the EIS explains that future NEPA reviews will also update impact assessments at the basin-wide
7    level.[80] Because BLM has reasonably explained the motivation for and manner in which it tiered
8    the project, it did not violate NEPA in so doing.

9              ### vii. Whether BLM violated NEPA by inadequately considering mitigation
10                    measures

11        An EIS must, in addition to enumerating environmental effects, include "a reasonably
12   complete discussion of possible mitigation measures."[81] The plaintiffs argue BLM's discussion
13   of mitigation was inadequate under NEPA because BLM failed to provide and analyze
14   "thresholds or triggers" for when additional mitigation would be necessary.[82] BLM responds that
15   its discussion of mitigation measures was appropriately detailed, and that no authority requires it
16   to provide thresholds for additional mitigation.[83]

17        An EIS's discussion of mitigation measures enables both the agency and the public to
18   "properly evaluate the severity of the adverse effects."[84] The EIS must also assess whether
19   proposed mitigation measures can be effective.[85] These requirements do not impose, however, a
20   "substantive requirement that a complete mitigation plan be actually formulated and adopted."[86]

21

22        [80] ECF No. 125 at 22.

23        [81] *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473 (9th Cir. 2000).

24        [82] ECF No. 88 at 33-36; ECF No. 98 at 40-42.

25        [83] ECF No. 107-1 at 46-56.

26        [84] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989).

27        [85] *S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 588 F.3d
     718, 727 (9th Cir. 2009).

28        [86] *Id.*

1       In this case, the discussion of possible mitigation measures in the EIS was reasonable

2    under NEPA for the first stage of the tiered project. BLM's approach to mitigation on this project

3    was to enter into stipulations with SNWA committing to monitor and mitigate if groundwater

4    rights are developed.[87] Those agreements contain detailed requirements for SNWA to collect

5    baseline data, so that it may establish early warning thresholds to mitigate project impacts.[88] A

6    table describing dozens of proposed mitigation measures is provided in the EIS.[89] The EIS also

7    describes project-wide mitigation measures that could be employed to address excessive

8    groundwater drawdown, including "geographic redistribution of groundwater withdrawals,"

9    "reduction or cessation in groundwater withdrawals," "recharge projects to offset local

10   groundwater drawdown," and "implementation of cloud seeding programs to enhance

11   groundwater recharge."[90] Courts have repeatedly upheld agencies' choices to defer specific

12   mitigation plans for complex projects where subsequent, site-specific choices were still

13   inchoate.[91] The plaintiffs seek to distinguish those cases, but do not point to a case where an

14   agency pursuing a legitimately tiered project was required to do more than BLM did here at the

15   first stage.

16       BLM also satisfied its requirement to assess, at least tentatively, how effective the

17   proposed mitigation measures are likely to be. The requirement is not a precise one and certainly

18   does not require development of, or commitment to, a complete mitigation plan.[92] BLM

19   explained that the monitoring and mitigation plan "will likely reduce potential impacts to critical

20

21

22   _____

         [87] AR 131424-509.
23
         [88] *Id.*
24       [89] AR 131176-193.

25       [90] AR 130119.

26       [91] *See, e.g., N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 979 (9th Cir. 2006);
     *Okanogan Highlands*, 236 F.3d at 473-77; *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*,
27   123 F.3d 1142, 1154 (9th Cir. 1997).

28       [92] *Robertson*, 490 U.S. at 352.

1 areas but would not entirely eliminate impacts to water dependent resources."[93]  BLM also

2 acknowledged that the "recovery of water levels . . . to pre-project conditions could take several

3 years or decades."[94]  Additionally, BLM conceded that

4    a long-term reduction in surface discharge at perennial surface water
5    source areas is likely to occur in some areas even after
     implementation of the SNWA proposed adaptive management
6    measures and proposed mitigation measures.   This potential
     reduction in surface discharge at perennial surface water source areas
7    is considered an unavoidable adverse impact associated with the
     proposed groundwater development.[95]
8

9 It is true that EPA sought more specificity from BLM about thresholds for additional mitigation

10 and likely effectiveness.  Besides taking EPA's comments seriously, however, BLM was not

11 statutorily bound to comply.  It is important to clarify that some of the concerns voiced by the

12 Center for Biological Diversity and EPA seem to be that environmental impacts will not be

13 completely mitigated, or more broadly that the harms of the project outweigh the benefits.  This

14 does not state a NEPA complaint, so long as BLM was appropriately forthright as to what those

15 impacts are likely to be.  BLM was within its discretion to conclude that the best approach was to

16 offer a broad discussion of mitigation in the programmatic analysis, followed by development of

17 a specific plan that will precede any approvals that actually allow groundwater extraction.

18        **viii.  Whether BLM violated NEPA by refusing to prepare a supplemental EIS**

19        The plaintiffs contend that BLM violated NEPA by failing to prepare a supplemental EIS

20 once it was informed of new information about the project's impacts on the environment.  BLM is

21 required to prepare a supplemental EIS if there "are significant new circumstances or information

22 relevant to environmental concerns and bearing on the proposed action or its impacts."[96]  "[A]n

23 agency need not supplement an EIS every time new information comes to light after the EIS is

24

25    [93] AR 130123.

26    [94] AR 132707.

27    [95] AR 130129.

28    [96] *Marsh*, 490 U.S. at 373.

finalized"; if that were the requirement, "agency decisionmaking [would be] intractable, always awaiting updated information only to find the new information outdated by the time a decision is made."[97] Instead, a supplement is required only if "new information shows that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered."[98]

Additionally, to require the agency to prepare a supplemental report, the new information must bear on federal actions not yet taken. The supplementation requirement is meant to ensure that the agency takes a hard look at any new information that might impact the agency's future decision-making. The agency must therefore still be poised to take "major Federal actio[n]" on the prior EIS and the information must be significant enough to potentially impact the agency's future decisions.[99] Otherwise, the agency is under no obligation to prepare a supplement.

I may overturn an agency's decision not to prepare a supplemental EIS only if it was arbitrary or capricious.[100] Whether new information is significant enough to warrant a supplement turns on technical expertise and underlying factual determinations, and therefore the agency is best positioned to decide.[101]

BLM has no substantive decisions left to make on the first phase of the project, so a supplemental EIS is of little use. As explained above, whether a supplement is required "turns on the value of the new information to the still pending decision-making process."[102] As to this first phase (the main pipeline right-of-way), BLM has little decision-making to do. It still must issue a final Notice to Proceed and a monitoring plan, but these are merely to ensure that SNWA complies with the terms of the existing approval. BLM will prepare new EISs at each phase of

---

[97] *Id.*

[98] *Or. Nat. Res. Council Action v. U.S. Forest Serv.*, 445 F. Supp. 2d 1211, 1219 (D. Or. 2006) (citing *Marsh*, 490 U.S. at 374).

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1095 (9th Cir. 2013).

the project, and those EISs will ensure that the agency considers any new data that the plaintiffs

are concerned about. The plaintiffs provide no authority suggesting that anything BLM has left to

do on this first phase triggers the duty to supplement. The one case they rely on, *Bundorf v.*

*Jewell*, is distinguishable because there BLM had not yet issued the right-of-way, so major

federal decision-making remained.[103]

What the plaintiffs really seek is for BLM to reconsider its prior decision and retroactively

void its prior approval. But that is not a proper basis for a supplemental report. Because the first

phase of the project has been approved, and because future phases will be separately reviewed

based on whatever new information exists at that time, I cannot say BLM abused its discretion in

declining to prepare a supplement to its initial EIS.

But even if BLM still had sufficient decisions left to make on its initial EIS, the plaintiffs

have not provided significant new information warranting a supplemental report.

### a. The Nevada court's reversal of the State Engineer's findings

Both the Center for Biological Diversity and White Pine County argue that BLM was

obligated to prepare a supplemental EIS based on the state court decision in *White Pine County v.*

*King,* which remanded the State Engineer's water rights allocation. But the state court ruling has

caused neither substantial changes for the pipeline nor brought to light significant new

information about the environmental impacts of the pipeline.

The state court found flaws in SNWA's mitigation agreements, that the appropriations

from three sites had been double allocated, and that removing this much water from the planned

well sites might not be in the public's interest. But these findings add little to BLM's decision-

making process. First, the state court's findings are not binding on BLM. Second, and more

importantly, the state court proceeding has not yet finished and the State Engineer has not issued

any new findings. Even if BLM wanted to draft a supplemental EIS, there is no new data about

---

[103] 142 F. Supp. 3d 1138, 1151 (D. Nev.), appeal dismissed (June 8, 2016), clarified on
denial of reconsideration, 142 F. Supp. 3d 1133 (D. Nev. 2015), appeal dismissed (June 8, 2016),
appeal dismissed (Oct. 26, 2016).

1  SNWA's allocation of water. At best, the plaintiffs' argument on this point is not yet ripe and

2  would need to be filed if SNWA's water allocation actually changes. Third, that there were some

3  problems with the State Engineer's findings is not "significant" new data that might inform

4  BLM's decision-making going forward, given that the errors do not reveal any quantifiable

5  problems with the data that BLM considered (at least at this stage).

6  **b. SNWA's most recent water resource plan**

7  The plaintiffs next argue that SNWA's new plan for water allocation constitutes

8  significant new data that BLM must analyze. SNWA has revised its allocation plan several times.

9  Its plan in 2004 was to start building the pipeline in 2006. SNWA's 2009 plan, which BLM

10  relied on in approving the right-of-way, planned to break ground on the pipeline in 2009 and

11  complete it in 2020. SNWA's 2015 plan suggests that there is a possibility that water from the

12  pipeline may not be needed until several years later than SNWA previously thought.[104]

13  SNWA's 2015 plan offers some helpful data to BLM. It indicates that the population in

14  southern Nevada may not grow as anticipated and that SNWA may not need as much water as

15  soon as it thought it might. But this is not enough to trigger a supplemental EIS. SNWA's new

16  plan merely suggests that it may be able to wait longer to draw water from the pipeline; it does

17  not suggest that the pipeline is not needed. The pipeline project is a long-term endeavor, and the

18  precise date that water will be needed, and the precise amount that will be sufficient to meet

19  southern Nevada's needs, is impossible to tell this far out. BLM and SNWA estimated SNWA's

20  needs at the time BLM made its decision. But the data will continue to fluctuate over the many

21  decades it will take to complete this project. Only when new significant data comes to light

22  would BLM be compelled to supplement.

23  **c. Climate change data**

24  The plaintiffs claim that new climate change studies warrant a supplemental EIS. The

25  first study is entitled, "Assessment of Climate Change in the Southwest United States" and was

26

27  —————————————

28  [104] ECF No. 89-4.

1  issued in 2013.[105]  The plaintiffs contend that BLM must supplement to consider the study's

2  findings that drought will be more frequent and intense than previously thought and that climate

3  change is more certain now.  The plaintiffs also offer a 2015 report by NASA, which similarly

4  concludes there will be an increased risk of drought in the Southwest.  The Ninth Circuit has

5  deferred to an agency's decision that new climate change data is not relevant to its actions, so

6  long as the agency's explanation is not arbitrary.[106]

7        Here BLM has adequately considered the impacts of climate change on its decision, and

8  these new studies add nothing significantly new.  The plaintiffs' real issue is with BLM's

9  decision to not include quantitative data for climate change in its modeling and calculations.  As

10  discussed above, BLM decided to consider climate change's impact qualitatively because it

11  determined that there was not enough hard data on the likely impact of climate change on

12  groundwater systems.  Nothing in these two studies suggests otherwise.  These studies provide no

13  new, raw data about how climate change might affect the pipeline's environmental impact.  They

14  conclude that climate change is likely to increase drought and rising temperatures, and BLM

15  already qualitatively considered this in its EIS.[107]

16  ### ix.  Whether BLM violated NEPA by failing to evaluate compliance with the Clean
17  Water Act Section 404(b) guidelines and compensatory mitigation rule

18        Although BLM's analysis of the project is mostly sound under NEPA, the same cannot be

19  said of the agency's consideration of whether the project will comply with the Clean Water Act.

---

21  [105] AR 191583.

22  [106] *Wild v. Connaughton*, 662 F. App'x 511, 515 (9th Cir. 2016) (rejecting NEPA
challenge based on new climate change studies because the plaintiffs failed to explain why the
23  agency's discounting of these studies was arbitrary); *Oregon Wild v. Constance Cummins*, No.
1:15-CV-01360-CL, 2017 WL 923917, at *4 (D. Or. Mar. 8, 2017).

24  [107] White Pine also suggests that BLM must consider new data about water supplies and
25  SNWA's potential to obtain water by desalinizing ocean water.  But there is virtually no evidence
that either of these issues has any meaningful impact on BLM's decision in this case.  Finally, the
26  plaintiffs complain that BLM adopted a final decision, modified Alternative F, which was not in
the original draft EIS.  But the approach BLM adopted was within the range of alternatives in the
27  original EIS, so it is permissible. *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037,
1045 (9th Cir. 2011).

1    NEPA requires that agencies not only analyze the direct environmental impact of a project, but

2    also whether that project will comply with other substantive laws, such as the CWA.  The Center

3    for Biological Diversity notes that the EIS predicts destruction of thousands of acres of wetlands,

4    but fails to address how BLM or SNWA will meet the CWA requirement to compensate for those

5    losses elsewhere.[108]  This omission, the Center for Biological Diversity contends, violates

6    NEPA's requirement to discuss whether and how the project will comply with other

7    environmental laws and policies.[109]  BLM responds that the CWA issue is unripe because SNWA

8    has not yet applied for a CWA permit and the Army Corps of Engineers has not stated what

9    compensatory mitigation it would require.[110]

10          An EIS "shall state how alternatives considered in it . . . will or will not achieve the

11   requirements of . . . other environmental laws and policies."[111]  The EIS indicates that the project,

12   when fully complete, will result in the long-term, and perhaps permanent, loss of many acres of

13   wetlands.[112]  Pursuant to its permitting authority under the CWA, the Army Corps of Engineers

14   will likely require SNWA to compensate for lost wetlands within the same watershed in a manner

15   "sufficient to replace lost aquatic resource functions" at "a minimum one-to-one . . .

16   compensation ratio."[113]

17          BLM responds that it is not clear at this stage exactly what the Corps will require of

18   SNWA, even if SNWA proceeds with groundwater extraction and the resulting wetlands

19   losses.[114]  There are different types of CWA Section 404 permits, and the Corps has some latitude

---

22          [108] ECF No. 88 at 36-38.

23          [109] Id. at 36 (citing 40 C.F.R. § 1502.2(d)).

24          [110] Id. at 57-58.  The Army Corps of Engineers reviews permits for activities that may
detrimentally affect "waters of the United States" under Section 404 of the CWA.

25          [111] 40 C.F.R. § 1502.2.

26          [112] AR at 130350.

27          [113] 33 C.F.R. § 332.3(b)(1), (f); 40 C.F.R. § 230.93(b)(1), (f).

28          [114] ECF No. 107-1 at 57.

1    in designing compensatory mitigation requirements.[115]  BLM therefore posits it is premature to

2    assess the feasibility of compliance and adds that it will have the opportunity to evaluate the

3    prospects for Section 404 compliance in subsequent NEPA reviews once SNWA has gone

4    through the Corps' permitting process.[116]

5        But just because BLM is uncertain about the precise compensation the Corps will require

6    does not mean that the agency can entirely ignore its responsibility to analyze whether

7    alternatives "will or will not achieve the requirements of" the CWA.  While the controlling

8    regulations give the Corps some discretion in designing permits, they still mandate that lost

9    wetlands be fully mitigated to the greatest practicable extent.  It was therefore unreasonable for

10    BLM to embark on this project without determining, at least in broad strokes, how SNWA would

11    replace or restore wetlands impacted by the project (or even whether compensating for thousands

12    of acres of destroyed wetlands is possible in the first place).  Assuming that the Corps does

13    require compensation in line with the CWA's terms—and BLM offers no concrete reason to think

14    it won't—it was arbitrary for BLM to approve major construction on this project without some

15    consideration of how SNWA might comply with the CWA.  BLM must address this issue on

16    remand.

17    **C. Challenges under FLPMA**

18      **i. Background**

19        FLPMA directs BLM to inventory federal public lands and coordinate with other agencies

20    about how to manage those lands in a productive way.[117]  This statute instructs that in so

21    managing, BLM must balance environmental, ecological, and recreational interests while also

22    providing for "multiple use and sustained yield" of the land.[118]

23

24

---

25    [115] *Id.*; 33 C.F.R. § 332.3.

26    [116] ECF No. 107-1 at 57.

27    [117] 43 U.S.C. § 1701(a)(2).

28    [118] 43 U.S.C. § 1701(a)(7).

1    FLPMA's definition of "multiple use" calls for the "combination of balanced and diverse

2    resource uses that takes into account the long-term needs of future generations for renewable and

3    nonrenewable resources, including, but not limited to, recreation, range, timber, minerals,

4    watershed, wildlife and fish, and natural scenic, scientific, and historical values . . . ."[119] FLPMA

5    affords BLM the discretion to determine which combination of uses "will best meet the present

6    and future needs of the American people."[120]

7        BLM is required to develop land use plans specific to particular geographic areas. BLM's

8    land use plans set goals and standards to guide its future decisions in that region. BLM is

9    required to "manage the public lands . . . in accordance with the land use plans."[121]

10       FLPMA allows BLM to grant rights-of-way across public lands for various uses,

11   including pipelines for the transportation of water. "In determining the duration of the right-of-

12   way, the [BLM] shall, among other things, take into consideration the cost of the facility, its

13   useful life, and any public service it serves."[122]

14       **ii. FLPMA claim for failure to comply with the Ely Resource Management Plan**

15       The plaintiffs claim BLM violated FLPMA because the pipeline project does not comply

16   with a land use plan the agency created: the 2008 Ely Resource Management Plan (RMP).[123]

17   They claim the EIS acknowledges the destruction of special status species habitat, aquatic habitat,

18   sagebrush habitat, and vegetation,[124] but fails to explain how the project will meet the

19   compensatory mitigation and other protective requirements imposed by this RMP. They also

20   complain that BLM has inappropriately limited its analysis of RMP compliance to the main

21

22       [119] *Id.* § 1702(c).

23       [120] *Id.; see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 57 (2004).

24       [121] 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3; *see also Or. Natural Desert Ass'n v. BLM*,
     625 F.3d 1092, 1097 (9th Cir. 2010).
25
         [122] 43 U.S.C. § 1764(b).
26
         [123] ECF No. 88 at 38-44; ECF No. 98 at 48-49.
27
         [124] They complain, though, that BLM is inadequately precise with respect to some habitat
28   losses. *See* ECF No. 88 at 41.

pipeline (the first phase of the project discussed in the NEPA section above), ignoring the RMP compliance threats from subsequent project stages.

BLM responds that it has ensured the first phase of the project complies with the Ely RMP, and that it will "refine[]" project terms and conditions for later phases.[125] BLM also contends that the plaintiffs significantly overstate the amount of habitat loss projected in the EIS.[126] To the extent that BLM elected mitigation alternatives that differ from those laid out in the RMP, BLM asserts it has the discretion to do so.[127] As to limiting its discussion of RMP compliance to the first phase of the project, BLM says FLPMA contains no requirement to preemptively ensure compliance for subsequent, related parts before taking action on a preliminary phase.[128]

While RMPs are "designed to guide and control future management actions,"[129] BLM has "a great deal of discretion in deciding how to achieve compliance with an RMP."[130] This discretion is a necessary function of BLM's task to balance multiple uses for land in a way to best meet the needs of the American people. BLM may not, however, take actions "inconsistent with the provisions of a land use plan."[131] In addition, an RMP may contain language that "creates a commitment binding on the agency."[132]

Most of the plaintiffs' complaints about how BLM chose to comply with the Ely RMP do not describe an abuse of discretion. For instance, BLM was entitled to determine that only nesting habitats for avian and bat species need to be replaced, rather than the more wide-ranging

---

[125] ECF No. 107-1 at 77.

[126] *Id.* at 77-78.

[127] *Id.* at 79-81.

[128] ECF No. 124 at 53-54.

[129] 43 C.F.R. § 1601.0-2.

[130] *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or. Aug. 21, 2013), *aff'd*, 638 F. App'x 648 (9th Cir. 2016) (quoting *Norton*, 542 U.S. at 66).

[131] *Norton*, 542 U.S. at 69.

[132] *Id.* at 71.

| | |
|---|---|
| 1 | foraging habitats.[133] BLM was also well within its permitted discretion in how it addressed broad |
| 2 | directives to protect vegetation, strategies that it incorporated in the terms of its right-of-way and |
| 3 | will incorporate into its COM Plan.[134] The EIS does not specifically address the RMP's |
| 4 | requirement to preserve sagebrush habitats, but does explain how BLM will preserve habitats for |
| 5 | sagebrush-dependent animals. Because BLM plausibly asserts those are the same habitats, it was |
| 6 | adequate for BLM to provide only one analysis.[135] Although a closer question, BLM was also |
| 7 | entitled to decide that temporarily disturbed habitat (even for up to 200 years) need not be |
| 8 | mitigated and that only permanently-lost habitat must.[136] |
| 9 | On the other hand, the RMP's requirement that BLM replace certain lost habitats (special |
| 10 | status species, aquatic species) at a 2-to-1 ratio is a clear, binding commitment on the agency. |
| 11 | BLM responds that it included that requirement in its right-of-way grant to SNWA for some of |
| 12 | the species.[137] For those species, BLM has met its FLPMA obligation. The statute does not |
| 13 | impose on BLM the additional burden of elaborating how SNWA will comply,[138] and the case |
| 14 | cited by the Center for Biological Diversity does not support the proposition.[139] |
| 15 | But BLM did not impose obligations on SNWA to comply with the 2-to-1 mitigation |
| 16 | requirement for all the special status species habitats.[140] It instead asserts that the RMP requires |
| 17 | BLM to apply compensatory mitigation on a "project-by-project basis" and reiterates that BLM |
| 18 | has discretion in interpreting RMPs. |
| 19 | //// |

---

[133] *See* ECF No. 107-1 at 78.

[134] *See id.* at 83-83.

[135] *See* ECF No. 124 at 62.

[136] *See* ECF No. 107-1 at 77-78.

[137] *See id.* at 78-79.

[138] *See id.* at 79.

[139] *See* ECF No. 88 at 42-43 (citing *Or. Natural Res. Council v. Brong*, 492 F.3d 1120, 1131-32 (9th Cir. 2007)).

[140] *See* ECF No. 107-1 at 79-81.

1    Neither point addresses the clear RMP requirement to replace lost habitat at a 2-to-1 ratio.

2    The phrase "[o]n a project by project basis" may be amenable to different reasonable

3    interpretations, but that the requirement is optional is not one of them.[141]  BLM therefore has not

4    complied with FLPMA with respect to special status species that will lose habitat due to

5    construction of the main pipeline.  There is also the prospect of future FLPMA violations for

6    BLM's failure to require 2-to-1 mitigation for special status species and aquatic habitats lost due

7    to groundwater pumping.  While premature as a complaint under FLPMA, this presents the same

8    NEPA problem as BLM's failure to explain how it might comply with Section 404 of the CWA.

9    On remand, BLM must consider how it might ensure compliance for all phases of the project with

10   the clear-cut compensatory mitigation requirements established by the Ely RMP.

11       **iii.  FLPMA claim for authorizing a permanent right-of-way in White Pine County**

12       The plaintiffs argue FLPMA limits BLM's authority to issue a right-of-way in perpetuity,

13   requiring instead that the agency limit rights-of-way to a specified period of time.[142]  BLM's

14   authority here comes from 43 U.S.C. § 1764, FLPMA's "general requirements" section for

15   issuing rights-of-way.  This section does not limit BLM's authority to issue permanent rights-of-

16   way, but requires only that the agency determine what a reasonable period would be under the

17   circumstances, considering "the cost of the facility, its useful life, and any public purpose it

18   serves."[143]  Nothing prevents BLM from determining that in any given project a permanent right-

19   of-way is the most reasonable term under the circumstances.  Indeed, the plaintiffs do not

20   seriously dispute that a permanent right-of-way is reasonable here.  BLM was mandated by

21

22       [141] BLM points out that desert tortoise habitat is granted a special carve-out in the RMP
     from the 2-to-1 mitigation requirement, and suggests that "if alternative measures may be applied
23   to the desert tortoise, it is reasonable for BLM to determine that alternatives to 2:1 compensatory
     mitigation may be applied to other species . . . ." ECF No. 124 at 54.  On the contrary, the
24   provision of a specific exception for desert tortoises suggests that BLM does not have general
25   discretion to ignore the requirement.

26       [142] Congress mandated permanent rights-of-way for two of the counties. *See* section
     4(b)(2)(B) of the SNPLMA, Pub. L. No. 105-263, and section 301(b)(2) of the LCCRDA, Pub. L.
27   No. 108-424.

28       [143] 43 U.S.C. § 1764(b).

1   Congress to issue permanent rights-of-way for two other counties, and given this project is

2   subject to a single grant, setting a different term for White Pine County makes little sense.

3          Instead, the plaintiffs point to another section of FLPMA to argue that BLM has no

4   authority to issue permanent rights-of-way at all. The plaintiffs rely on 43 U.S.C. § 1761(c),

5   which governs "Permanent easement[s] for water systems." This section states that certain

6   easements across National Forest Lands should be permanent. The plaintiffs conclude that

7   FLPMA must prohibit permanent grants generally, and that this exception for forest lands is a

8   narrow carve-out for a special type of easement. But there is no textual support for this

9   interpretation of the statute. The text that authorizes rights-of-way says that the term must be

10  reasonable, it says nothing about limiting BLM's authority to issue permanent grants. That

11  Congress mandates one type of grant to be permanent does not mean that it intended to revoke an

12  agencies' power to grant a permanent right-of-way in other situations when the circumstances

13  warrant it. If Congress meant to expressly limit BLM's authority as the plaintiffs suggest, it

14  could have said so.

15         To the extent that there is any ambiguity as to whether BLM has authority to issue

16  permanent rights-of-way under § 1764, the agency's reasonable interpretation would prevail.[144]

17  BLM's regulations interpret § 1764 as allowing permanent grants so long as they are reasonable

18  under the circumstances.[145] Given there is no express language in the statute to suggest that BLM

19  does not have this authority, BLM's interpretation is entitled to deference. This is particularly

20  true here given BLM's longstanding interpretation of its authority to issue these grants,[146] as well

21

22

23

24
        _____

        [144] See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-44 (1984).

25      [145] 43 C.F.R. § 2805.11(b)(2).

26      [146] In the preamble to the final rule promulgating the regulations at issue, BLM stated that
        the grant of a right-of-way in perpetuity may be appropriate in "a variety of circumstances," and
27      that it "frequently issue[s] perpetual grants to governmental entities for permanent facilities such
        as county roads." 70 Fed. Reg. 29,970, 21,010 (Apr. 22, 2005).
28

as the legislative history, which suggests that permanent grants are permissible.[147]  I thus reject

this challenge.

### iv. FLPMA claim for failure to prevent unnecessary and undue degradation and damage to the environment

White Pine County argues that BLM violated its FLPMA mandate to "prevent

unnecessary or undue degradation" to the lands it manages.[148]  The County acknowledges,

however, that neither FLPMA nor its implementing regulations define "unnecessary or undue

degradation."  Such broad language, in conjunction with FLPMA's multiple use mandate, gives

BLM extensive discretion in interpreting what environmental impacts are unnecessary or

undue.[149]  BLM expressly incorporated in its discussion of environmental impacts and mitigation

measures its determination that the project did not cause unnecessary or undue degradation.[150]  I

defer to this determination.

### v. FLPMA claim for failure to ensure compliance with air quality standards

White Pine County argues that the project violates BLM's FLPMA obligation to comply

with federal and state air quality standards.  While the County does not specify what standards the

project violates, it contends that BLM failed to sufficiently explore the question by choosing not

to evaluate impacts to air quality for water drawdowns under ten feet or after 200 years.[151]  BLM

responds that it prepared a model of dust emissions based on future groundwater pumping and

found that dust emissions would not violate air quality laws.[152]  This satisfied BLM's burden at

this point to assess possible future compliance issues with FLPMA.  As discussed above, it was

---

[147] A House report on Section 504 of FLPMA states, "The requirement that the term of a right-of-way be 'limited to a reasonable term' does not prevent the issuance of rights-of-way for indefinite terms . . . ." H.R. Rep. No. 94-1163, at *22 (May 15, 1976).

[148] ECF No. 98 at 47-48 (citing 43 U.S.C. § 1732(a) & (b)).

[149] See, e.g., Gardner v. Bureau of Land Mgmt., 638 F.3d 1217, 1222 (9th Cir. 2011).

[150] AR 188174.

[151] See ECF No. 98 at 51-52.

[152] ECF No. 124 at 63.

1 within BLM's discretion to decide that impacts of groundwater withdrawal under ten feet or

2 beyond 200 years were too minimal or speculative to yield meaningful insight. And BLM adds

3 that it will conduct more robust analysis as part of its COM Plan and future NEPA analyses.[153]

4       **vi. FLPMA claim for failure to ensure SNWA's financial capability to construct,**

5           **operate, maintain, and terminate its project**

6       White Pine County argues that BLM violated FLPMA by failing to establish that SNWA

7 "has demonstrated the financial capability to construct, operate, and maintain" the project.[154] The

8 County concedes that the EIS contains an analysis of SNWA's financial capability, but contends

9 that the analysis underestimates the project's costs for monitoring, management, and mitigation,

10 thus rendering the financial capability estimate infirm.

11       BLM responds that its duty under FLPMA was only to ensure it was "satisfied that

12 [SNWA] has the technical and financial capability to construct the project," which SNWA

13 demonstrated with a report from a financial consultant.[155] The consultant specifically found that

14 SNWA has the "flexibility and capability" to cover the costs of management and mitigation.[156] In

15 its response, SNWA notes that it added a 30 percent "monitoring, management, and mitigation"

16 factor to account for these costs.[157] White Pine County does not address the issue in its reply.

17 BLM was reasonable in concluding that SNWA has the financial capability to construct and

18 manage the project, especially given that SNWA specifically budgeted a significant amount for

19 management costs.

20 / / / /

21 / / / /

22 / / / /

23

24 —————————————

25 [153] *Id.*

26 [154] ECF No. 98 (citing 43 U.S.C. § 1764(j)).

27 [155] ECF No. 107 at 74.

28 [156] *Id.*

[157] ECF No. 110 at 72.

## D. Challenges under the National Historic Preservation Act

### i. Background

Section 106 of the National Historic Preservation Act (NHPA) requires federal agencies to consider the potential effects of federal actions on historic properties.[158] Section 106 requires BLM to "take into account the effect of [an] undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]."[159] Like NEPA, Section 106 of the NHPA "is a stop, look, and listen provision that requires each federal agency to consider the effects of its programs."[160]

Agencies must also "consult with any Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by an undertaking." [161] And it must "provide[] the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."[162]

An agency must "make a reasonable and good faith effort" to identify historic properties within a project's area of potential impact.[163] If the agency finds that historic or culturally significant sites may be affected, it must solicit the views of the various interested parties. The agency then considers whether there is an adverse effect, and if so, engages in further consultation about resolving those harms. Similar to NEPA, the NHPA's regulations permit an agency to "use a phased process to conduct identification and evaluation efforts" or to "defer final identification

---

[158] When the parties briefed this case, the relevant provisions were at 16 U.S.C. § 470f (2013). But in December 2014, NHPA Section 402 was moved to Title 54 of the U.S. Code, and the specific provision now is found at 54 U.S.C. § 306108.

[159] 54 U.S.C. § 306108.

[160] *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).

[161] 36 C.F.R. § 800.2(c)(2)(ii)(A).

[162] *Id.*

[163] 36 C.F.R. § 800.4(b)(1).

1   and evaluation of historic properties" under certain circumstances, including where the

2   alternatives under consideration involve "large land areas" or "corridors."[164]

### ii. Whether BLM violated the NHPA's Section 106 consultation requirements

4     The NHPA implementing regulations require BLM, at all stages of the section 106

5   process, to consult with tribes that "attach[] religious and cultural significance to historic

6   properties that may be affected by an undertaking."[165] Further, "[c]onsultation should commence

7   early in the planning process, in order to identify and discuss relevant preservation issues," and

8   "must recognize the government-to-government relationship between the Federal Government

9   and Indian tribes."[166]

10    The plaintiffs first argue that BLM failed to adequately consult with the tribes because the

11  agency does not yet have "adequate information about water appropriations, or the location of the

12  pipeline and its pumping stations." This argument rehashes the same challenges that I reject

13  above. There is nothing in the NHPA or NEPA that precludes BLM from approving the pipeline

14  project in phases. BLM cannot be faulted for consulting with the tribes before having more data

15  because it is approving the first phase of this project without the benefit of all of the evidence it

16  needs to decide whether to approve future phases of the project. This approach is reasoned and

17  thus not arbitrary. And the regulations and relevant case law support BLM's approach on this

18  point.[167]

---

[164] 36 C.F.R. § 800.4(b)(2).

[165] 36 C.F.R. § 800.2(c)(2)(ii).

[166] *Id.* § 800.2(c)(2)(ii)(C).

[167] 36 C.F.R. § 800.14(b)(ii) (programmatic agreements appropriate "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking"); *Honolulu-traffic.com.*, 742 F.3d at 1233-34 (approving phased approach to identification of burial sites where "exact route and placement of the support columns had not yet been determined"); *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d, 592, 610 (9th Cir. 2010) (for the same reason that "a phased exploration project in some circumstances can be fully approved without all the details of the separate phases" under NEPA, the court "reach[ed] the same conclusion in the NHPA context").

The plaintiffs also argue that BLM's single face-to-face meeting with the Goshute tribe was insufficient consultation. But the record indicates that BLM did much more than that. BLM invited this tribe to engage in formal consultation five years prior to the pipeline's approval. Both BLM's Field Manager and Nevada State Director engaged in consultation at different points, as did BLM's Project Manager, Ethnographer, and Associate Field Manager responsible for the Project.[168] BLM, through various agency officials, attended at least six meetings on the Goshute Tribe's reservation while considering the project.[169] BLM's consultation was much more robust than the efforts other courts have found insufficient.[170]

### iii. Whether BLM failed to properly identify impacts on cultural resources

BLM is required to engage in a good faith effort to identify cultural resources that might be impacted by the project and to consult with the tribes about them. BLM did that. BLM created a 137-page cultural resources inventory and a 147-page ethnographic assessment for this project.[171] The authors of the ethnographic assessment relied on interviews with tribe members and site visits in 2008 and 2009 attended by the Goshute Tribe's representatives, as well as prior studies and scholarly references. The ethnographers prepared a report, successive drafts of which were circulated among identified Indian tribes.[172] Indeed, the Goshute Tribe passed a resolution

---

[168] AR 189782-86.

[169] AR 189814. The Goshute tribe also contends that BLM acted arbitrarily when it did not designate certain tribes as "cooperating agencies." But BLM had discretion whether to designate the tribe with this status, and the tribe has not offered any analysis or explanation as to why this decision was arbitrary.

[170] See, e.g., Quechan Tribe of the Fort Yuma Indian Reservation v. U.S. Dep't of Interior, 755 F. Supp. 2d 1104 (S.D. Cal. 2010) (finding insufficient consultation because the agency did not meet with the tribe until after the project was approved, never invited the tribe to engage in government-to-government consultation with anyone at the field manager level or higher, did not engage in any meetings with the tribal council, and repeatedly rebuffed requests for consultation).

[171] AR 220338-474; AR 190410-557.

[172] See AR 131003-06 (describing methodology for Weidlich & Molenaar ethnographic assessment and tribal participation in process).

1     endorsing the report's identification of sacred sites.[173]  BLM thus engaged in a good-faith attempt

2     to identify relevant cultural sites and consult with the tribes about how best to protect them.

3                  **iv.  Whether BLM violated reserved tribal water rights**

4         Under *Winters v. United States*, 207 U.S. 564 (1908), when the United States sets aside an

5     Indian reservation, it impliedly reserves water for the reservation.  The Goshute tribe contends

6     that BLM failed to adequately consider how SNWA's pumping will impact its federally-reserved

7     water.

8         The tribe fails to point to any specific water rights that might be impacted by the

9     pipeline.[174]  And BLM conducted a thorough review of potential impacts to federal water

10     reserves.  BLM inventoried reserved water rights and identified the rights that had been

11     adjudicated in Nevada and Utah.  BLM explained in the EIS that the state databases do not

12     necessarily include unadjudicated federal reserved water rights, and therefore the location and

13     quantities of some rights are unknown.  But BLM analyzed the impacts to water resources—

14     including an estimation of any unidentified reserved water rights—from groundwater pumping

15     and mitigation to minimize those impacts.

16         The Goshute Tribe also argues that BLM failed to consider impacts to the tribe's

17     aboriginal hunting and fishing rights.  But the EIS discusses the historic use of the area by the

18     Goshute Tribe and other tribes for hunting, fishing, and pine nut gathering.  And it discusses that

19     the pipeline could affect their traditional uses of land within the analysis area.  The agency thus

20

21

22

23

24

---

[173] AR 131005, 23979.

[174] BLM offers evidence that the pipeline is not expected to have any impact on the tribe's water resources. AR 130104. The tribe cites some letters from BLM, but they are unhelpful. In one, BLM merely explained that future water adjudications were not within the scope of its EIS. In the other, the agency explained that its EIS was not necessarily coextensive with SNWA's water stipulations. Neither of these suggests that BLM failed to consider federal water reserves.

considered these issues, which is all that is required here.  Finally, the tribe waived its right to
bring challenges based on reserved water rights, so it cannot bring that claim now.[175]

**III.    CONCLUSION**

IT IS THEREFORE ORDERED that the plaintiffs' motions for summary judgment **(ECF
Nos. 87, 93, 97, and 99) are GRANTED IN PART AND DENIED IN PART** as set forth
above.

IT IS FURTHER ORDERED that the defendants' motions for summary judgment **(ECF
Nos. 107 and 110) are GRANTED IN PART AND DENIED IN PART** as set forth above.

IT IS FURTHER ORDERED that the identified issues are remanded to BLM.  The clerk
of the court is directed to close this case.

DATED this 23rd day of August, 2017.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE

---

[175] ECF No. 62 at 2 ("Because plaintiffs have clarified they are not asserting independent
claims based on AIRFA or reserved water rights, I deny as moot defendants' motion to dismiss
counts thirteen and fourteen.").